**People of the State of Illinois, Plaintiff-Appellee, v. Joseph T. Young, Defendant-Appellant.**

**Gen. No. 49,906.**

First District, First Division.

December 13, 1965.

Herman E. Smith, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and E. Roger Horsky, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

Defendant, Joseph T. Young, was convicted in a bench trial of the crime of armed robbery and sentenced from one to five years in the penitentiary. On appeal, he contends that the state failed to prove him guilty beyond a reasonable doubt and disregarded his defense of alibi.

Complainant, Charles A. Thedford, testified that on November 28, 1963, he was employed at 2801 S. State Street, Chicago, as a service station attendant. At approximately 5:00 a. m., a young man approached him requesting a package of cigarettes. He unlocked the cigarette box and turned to hand him the cigarettes when the man, holding a pistol in his hand, said "This is a stick up." He gave the man twenty dollars after which the holdup man turned in a menacing manner "like he was going to shoot or something." Thedford fell behind some anti-freeze cases and the man started to run across State Street. Thedford gave chase and the culprit fled into the housing project across the street. Although it was dark at the time, the canopy around the station was well illuminated with fluorescent lights. He said that two or three minutes elapsed from the time he was asked for the cigarettes and the time he jumped behind the anti-freeze cases, and that in this time he was able to observe the man who held him up. The police responded to his telephone call within five minutes and he gave them a description of the robber. He said the man was between 19 and 20 years old; between 5′ 6″ and 5′ 8″ in height, weighing between 135 and 150 pounds; had process hair, with a pompadour, and was a Negro. He identified defendant in court as the man who held him up. On January 20, 1964, at about 2:30 in the afternoon he arrived at the service station, changed clothes and went out to service a car when he saw defendant and his father in a car being "pushed into the station by another

187

automobile." Defendant got out of the car and asked him for change for a "ten." The complainant replied that he did not have change and told the defendant to come inside the gas station. When he did, the complainant "told him he was the man that stuck me up and would he wait until the police came." Defendant hesitated but he agreed to wait. Complainant called the police and had the defendant placed under arrest.

On cross-examination Thedford was asked in detail about the thief's description and how he described him to the police. He said the man had brown eyes, a dark complexion, fairly thick lips, and was not particularly muscular. Defense counsel asked whether he noticed the man's fingernails and he replied that he had a bruised thumbnail but wasn't sure on which hand. He didn't remember if he gave this detail to the police. He was pretty shaky after the stick up. When asked if he noticed any other marks, he said the man had a mole on the left side of his neck but didn't remember if he had told this to the police. He observed defendant's neck on the date of the arrest and that was what made him "really know" he was the man. The money was taken from the top breast pocket of his uniform.

The only other witness for the state was Leon Barnett, police officer, who responded to complainant's phone call on January 20, 1964. He found the complainant and the defendant in the gas station. Complainant told him that he was robbed on Thanksgiving morning by the man who was standing there. Defendant denied it.

Defendant testified that on November 27, 1963, he resided in the housing project at 2940 State Street, a block south of the Clark station on the other side of the street. He arrived home at apartment 505 that day about 7 or 8 p. m. He had his supper and watched TV until it went off the air. He then played the radio in his bedroom. Some time between 4:30 and 5 a. m. Thanksgiving morning, a neighbor, Mr. Wade, knocked on the

door. Defendant answered the knock and Wade asked that the radio be turned down. His mother got out of bed and his father came to the door. Defendant turned off the radio and went to sleep. He did not get up until around noon and hadn't left the house at any time after Wade had left. He denied the robbery. He testified he has a mole on the right side of his neck. He has a discoloration on his right thumb, but he said it was the result of an injury he received when shutting a cell door since he has been in custody.

Jack Wade, the neighbor, said he lived in apartment 506, next door. Between 4:20 and 4:30 a. m. he went to the Young apartment to complain of the loud radio. Defendant answered the door. Wade asked him to turn down the radio and defendant said he would. The father came to the door and when told of the reason for Wade's visit, said he was sorry and told defendant to go to bed. The father then asked him in. He stayed for about ten minutes—no longer. Defendant, at the time he saw him, had a black bandanna around his head, a tee shirt, and a pair of shorts. The mother asked Wade what he was doing up so late and he told her it was one of those nights he couldn't sleep and in the meantime was already cooking. He had some ribs in the stove and had to go back and check them. He returned to his apartment and attended to his cooking until the paper boy brought the newspaper at approximately 6:30 a. m. Nothing unusual occurred before the arrival of the paper boy. He testified that he could have heard any noise on the floor of the building very well and that it is impossible for anyone to walk out of any of the eight apartments there without someone that is awake not hearing it because "the locks are made so that they open, they lock automatically." He said that he could not have missed hearing it; that their apartment doors are approximately three feet apart; that the partitions are very thin, and that you can hear from one apartment to the adjoining apartments.

Defendant's father and mother testified they and the defendant were home at the time the robbery occurred; that Wade was present, as he related; and that defendant did not leave the apartment until some time Thanksgiving afternoon.

Defendant called police officer Fred Harris. He and his partner had responded to the robbery call at about 5:10 a. m. on November 28, 1963. After his partner had spoken to the complainant, a police report was made, which he produced. He did not remember any description of a mole or any reference to a discoloration of the thumb being given and none appeared in the report.

Defendant attacks the insufficiency of the identification by the complainant alone and describes it as an "unsupported accusation of a single complaining witness whose testimony was, in many important respects, so improbable, contradictory and contrary to human experience as to be beyond belief."

Testimony of one witness alone, if it is positive and the witness credible, is sufficient to convict even though the evidence is contradicted by the accused. People v. Miller, 30 Ill2d 110, 113, 195 NE2d 694 (1964). Where material facts in issue are conflicting, it is the duty of a jury, or of a court sitting without a jury, to determine the credibility of the witnesses and the weight to be given their testimony, and on review this court will not substitute its judgment for that of a jury, or trial court. But it is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of the defendant's guilt the conviction will be reversed. People v. Coulson, 13 Ill2d 290, 295, 296, 149 NE2d 96 (1958). The court, in Coulson, on page 296, said: "A judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of the guilt of the defendant, and it is the insufficiency of the People's evidence which creates such doubt. If a con-

190

viction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case."

Defendant contends that the conviction was based on the unsupported accusation of a single witness whose testimony was, "in many important respects" so improbable, contradictory and contrary to human experience as to be beyond belief. He says the complaining witness gave a general description of the robber to the police that would apply to thousands of persons, but when confronted with defendant in the courtroom he proceeded to amplify and modify the description trying to buttress it by describing a discolored thumbnail and a "supposedly present" mole on the thief's body. From the record we find that defendant's counsel, in his arduous cross-examination, elicited the additional descriptive testimony, calling upon the witness's recollection and memory. The witness did say he was "shaken up" after the robbery and did not remember fully describing the thief to the police.

Defendant further argues that it is unbelievable that defendant would rob a gas station a block or so from his home, where he traded; that having a prominent mole on his neck, and wearing a crew neck sweater, would expose it to view while committing a crime; and that he would return to ask the victim for change; and when accused of the robbery would agree to wait for the police. The record before us does not reflect that the defendant had traded at the station at any time. The record does reveal, however, that the defendant's arrival on the day of arrest was the result of being in an evidently stalled car that was "pushed" into the station.

People v. Stewart, 62 Ill App2d 428, 211 NE2d 154 (1965) affirmed a robbery conviction based upon the sole identification of a single witness, holding that the effect of minor variations or lack of recollection by the witness upon the credibility of that witness is a matter for the

trial court's determination. It is significant to note that in the Stewart case, the witness and defendant had seen each other prior to the day of the commission of the crime.

In People v. Parks, 54 Ill App2d 442, 203 NE2d 434 (1964) (abst), the court found that the fact that an accused charged with armed robbery of a gas station was acquainted with the attendant whom he allegedly robbed and was thus subject to a conclusive identification, did not render the armed robbery an act so contrary to human experience as to defeat a conviction. We cannot say in the instant case that the evidence against the defendant is so unsatisfactory and unreasonable as to raise a serious doubt of the defendant's guilt. We are of the opinion that the trial court did not err in finding the state's evidence was not improbable, unconvincing or contrary to human experience.

 Finally, defendant charges that the trial court erred in disregarding his testimony and that of his witnesses regarding his whereabouts at the time the crime was committed. His defense was an alibi. "Alibi is an affirmative defense. Where the corpus delicti is proved, together with evidence tending to show the guilt of a defendant, the burden of establishing an alibi rests upon him, although upon the whole case his guilt must be proved beyond a reasonable doubt." People v. Renallo, 410 Ill 372, 376, 102 NE2d 116 (1951). Here, the determination of the credibility of these witnesses and the weight to be accorded to their testimony was committed to the trial judge. He saw and heard the witnesses and we cannot say he was not warranted in discounting the alibi evidence.

For these reasons, the conviction will be affirmed.

Affirmed.

BURMAN, P. J. and MURPHY, J., concur.